IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 7, 2016

**MITCHELL GARNER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-02157         Glenn Ivy Wright, Judge**
_____

**No. W2015-02431-CCA-R3-PC  -  Filed April 18, 2017**
_____

The Petitioner, Mitchell Garner, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction of aggravated sexual battery and resulting twelve-year sentence. On appeal, the Petitioner claims that he received the ineffective assistance of counsel. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Mitchell Garner.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and David M. Zak, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the victim testified that in December 2007, she was a prostitute. State v. Mitchell Garner, No. W2008-01333-CCA-R3-CD, 2010 WL 571793, at *1 (Tenn. Crim. App. at Jackson, Feb. 18, 2010). In the early morning hours of December 17, the victim left the motel room she was sharing with her boyfriend in order to obtain crack cocaine. Id. She was not working as a prostitute at that time. Id. The Petitioner, who was a large, African-American male, called to the victim from his semi-trailer truck, which was parked in an empty parking lot across from the motel. Id. He got out of the truck and talked with the victim in the lot. Id. The Petitioner wanted "'a date'" for $30. Id. When

the victim refused, he grabbed her, wrestled her to the ground, and started beating and choking her. Id. The victim pulled out a pocketknife she carried for protection, but the Petitioner took it and cut her wrist and mouth. Id. He also pulled down her pants and penetrated her vagina with his fingers. Id. The victim said that she repeatedly "'went out'" due to the choking and that she did not know if he penetrated her with his penis. Id. The attack lasted for hours and ended when a police officer pulled over someone near the truck. Id. On cross-examination, the victim denied telling police that a white man was in the passenger seat of the truck and said that she did not see anyone other than the Petitioner. Id.

A police officer testified that he stopped a motorist nearby, heard the victim screaming, and found her naked and covered in blood. Id. at *2. He ordered the Petitioner out of the truck at gunpoint and saw that the Petitioner had blood on his shirt and pants and scratches on his face. Id. at *2. The Petitioner offered several different explanations for what had happened to the victim, including that she tried to rob him and that he defended himself. Id. After the officer handcuffed the Petitioner, he noticed that Chad Harris, who was white, was in the truck's passenger seat. Id. A second officer who arrived on the scene noticed that the truck had a broken window. Id.

The victim spent eleven days in the hospital, including four days in the intensive care unit. Id. at *1, 2. A forensic nurse testified that the victim had injuries all over her body and that blood was in her vaginal area, which was consistent with digital penetration. Id. at *3.

A police officer spoke with the victim at the hospital in the early morning hours of December 17 and testified that she told him "'a white person had stopped and offered her money for sex; when she refused to perform the sex act, that she was attacked.'" Id. at *2. However, the victim told another officer the day after the attack that the Petitioner penetrated her with his fingers, that he attempted to penetrate her with his penis, and that no one else was involved. Id. at *3.

Forensic testing revealed that the victim's DNA, but not the Petitioner's DNA, was on the bloody pocketknife. Id. Blood with the victim's DNA also was on two shirts the Petitioner was wearing at the time of the attack. Id. Vaginal swabs collected from the victim did not reveal the presence of semen or sperm. Id.

The Petitioner testified at trial that he and his co-driver, Harris, were on a mandatory break when he saw the victim. Id. The victim approached the truck and asked to "'entertain'" them for $30. Id. Harris offered to pay for both of them, so the victim entered the truck, undressed, and began performing oral sex on Harris. Id. Harris was unable to obtain an erection, became upset, and threw the victim's clothes out of the

truck.  Id.  The victim retrieved her clothes and was upset that she had not been paid, so she threw a stone through the truck's windshield.  Id.  The Petitioner said he exited the truck to calm the victim.  Id.  When he walked away from her, she hit him on the back of his head and cut his forehead with a knife.  Id.  The Petitioner then hit the victim's face more than five times.  Id.

Although the Petitioner had been charged with aggravated rape, a Class A felony, the jury convicted him of aggravated sexual battery, a Class B felony, and he received a twelve-year sentence.  On direct appeal of his conviction to this court, he argued that the evidence was insufficient to support the conviction because the victim was not credible and that the trial court misapplied enhancement factors (9), that the defendant possessed a deadly weapon during the offense, and (13), that at the time the felony was committed, the defendant was "[o]n any other type of release into the community under the direct or indirect supervision of any state or local governmental authority or a private entity contracting with the state or a local government."  Id. at *5.  This court found that the evidence was sufficient and that the trial court properly applied both factors.  Id. Regarding enhancement factor (13), this court stated as follows:

> Garner asserts that factor (13) was not met because, as a sex offender, he was not under the direct or indirect supervision of any state or local governmental authority.
>
> . . . .
>
> Factor (13)(G) broadly refers to "any other type of release into the community under the direct or indirect supervision of any state or local governmental authority . . . ."  T.C.A. § 40-35-114(13)(G) (2005).  Garner was required to register as a sex offender in Ohio where he was convicted of sexual battery.  As a sex offender, Garner was under the supervision of the state of Ohio.  This was evident in 2004 when Garner was convicted by an Ohio court of violating the state's sex offender registry law.  The trial court did not err in applying factor (13).  Garner has not met his burden of showing the impropriety of his sentence, and therefore he is not entitled to relief.

Id. at *5-6.  Accordingly, this court affirmed the Petitioner's conviction and sentence.

In February 2011, the Petitioner, represented by counsel, filed a timely petition for post-conviction relief, raising various claims of ineffective assistance of counsel at trial,

- 3 -

including that counsel failed to investigate the case adequately, failed to call defense witnesses to testify, and failed to object to inadmissible evidence. He also alleged the ineffective assistance of appellate counsel because counsel failed to file an application for permission to appeal to our supreme court after this court affirmed his conviction and sentence. In September 2011, the Petitioner filed an amended petition, basically reiterating the issues raised in the pro se petition.

Four months later, in January 2012, post-conviction counsel filed a motion for DNA analysis pursuant to the DNA Analysis Act of 2001, requesting analysis "on three cotton swabs of [the Petitioner's] fingers and hands which were taken after the victim in this case accused him of digitally penetrating her vaginally, for the purpose of establishing that he did not commit aggravated sexual battery[.]" In the motion, counsel argued that if DNA on the swabs did not match the victim's DNA, then "[a] reasonable probability exists that this evidence will serve to cast doubt on the victim's identification and her claim that the petitioner intentionally touched her intimate parts and/or clothing." On July 1, 2013, the post-conviction court granted the motion and ordered that "the Tennessee Bureau of Investigation . . . analyze the three swabs taken from the Petitioner's hands to determine if there is a positive match for the victim[.]" An "OFFICIAL SEROLOGY/DNA REPORT," issued on January 9, 2014, stated that DNA analysis was performed on "[s]wabs from the scene." According to the report, blood was found and was "consistent with a mixture of genetic material from two or more individuals." The major contributor to the mixture was the victim, and the minor contributor was "inconclusive." The report stated that fluid samples and three control samples were not tested.

On July 18, 2014, the post-conviction court held an evidentiary hearing regarding the claims raised in the Petitioner's pro se and amended petitions for post-conviction relief. During the hearing, the Petitioner testified that he was arrested in December 2006 for aggravated rape and that he had been in confinement since that time. An attorney from the public defender's office was appointed to represent him, and she filed a motion for DNA testing of all the physical evidence in this case. However, she had to withdraw from representation because the victim had numerous cases pending and also was being represented by the public defender's office. The Petitioner retained counsel in March 2008, about one month before he went to trial. Counsel met with the Petitioner at least twice, and they discussed trial strategy, "which basically was the victim wouldn't show up." The Petitioner asked counsel about DNA analysis on his hand swabs, and counsel told him that "the prosecutors did not want to test the rape kit hand samples because they [felt] they [had] enough evidence to convict [him] off the victim's statement." The Petitioner kept requesting that counsel have the swabs tested, but counsel never did. He said that at the time of the post-conviction evidentiary hearing, his hand swabs still had not been analyzed and that he thought they had degraded so that they were untestable.

The Petitioner testified that the State offered to allow him to plead guilty to aggravated rape in exchange for a forty-one-year sentence to be served at 100%. The Petitioner stated, "I did better than that [at trial] but at the same time I'm an innocent man." After the jury convicted him of aggravated sexual battery, he thought he was going to receive an eight-year sentence. Instead, he received twelve years, the maximum punishment in the range. He said he and counsel did not meet or discuss enhancement factors prior to sentencing. In December 2007, the Petitioner was a registered sex offender in Ohio but was not on probation or parole. He said he did not think being a registered sex offender qualified as "supervision" because

> [i]t is to know my whereabouts and my residence. It is not to be used as supervision. It is just to monitor my whereabouts and not to be used against me, to my understanding of the constitution, as a punitive matter where I could be punished for a crime after I already paid my debt to society.

On cross-examination, the Petitioner acknowledged that a nurse testified at trial that trauma to the victim was consistent with sexual battery. He also acknowledged that the jury heard that the victim told police the perpetrator was "a white guy." However, the victim's blood was on the victim's knife and the Petitioner's shirts. The Petitioner said, "I'll admit I put my hands on that lady." He said, though, that he was trying to stop her from stabbing him and that he did not digitally penetrate her. On redirect examination, the Petitioner acknowledged that he beat the victim and that her DNA would be on his hands. On recross-examination, the Petitioner testified, "The controlled samples have not been tested." The State responded, "The control samples were swabs of your hands. Correct?" The Petitioner answered, "Yes."

At the conclusion of the Petitioner's testimony, post-conviction counsel advised the post-conviction court that DNA analysis of the victim's vaginal swabs had revealed two contributors of DNA: a primary contributor and a secondary contributor. Post-conviction counsel stated that the primary contributor was identified as the victim but that the identity of the secondary contributor was "inconclusive." The Petitioner explained as follows: What I'm trying to say, Your Honor, . . . this lady she submitted a rape kit and in the rape kit they found blood and they found another unknown male . . . , sir, and if I was supposed to [have] penetrated her digitally, then that same unknown male . . . would be on my hand samples, sir. That's what I'm saying."

Trial counsel testified that the Petitioner "got around" to hiring him one or two months before trial but that he had talked with the Petitioner "[l]ong before" he was retained and "basically knew the case." Counsel visited the Petitioner five or six times,

and they discussed trial strategy, discovery, and DNA evidence. The defense's strategy was that the Petitioner beat the victim because she attacked him and that he did not rape her. Counsel told the Petitioner that DNA testing "could either go against you or for you," and the Petitioner never said he wanted additional testing.

Trial counsel testified that the State did not have DNA evidence showing the Petitioner penetrated the victim. Counsel did not pursue testing of the hand swabs because the results would not have proved or disproved penetration. Counsel and the Petitioner talked about Harris, but the Petitioner did not know how to contact Harris. The Petitioner's version of the events on December 17 never changed, and the victim was a "poor" witnesses at trial. Counsel stated, "What convicted Mr. Garner [was] the pictures [of the victim's injuries]."

Trial counsel testified that he and the Petitioner probably met one time before sentencing and that he thought the Petitioner would get a ten-year sentence because the facts of the case were "bad" and because the Petitioner had prior convictions. Counsel did not think the Petitioner was on any type of release at the time of the crime, but the trial court applied enhancement factor (13) because the Petitioner was a registered sex offender. Trial counsel also represented the Petitioner on appeal, and this court agreed with the trial court. Counsel said he did not appeal the release issue to our supreme court because the verdict "came back in our favor" and because he did not think an appeal would affect the length of the sentence. On cross-examination, counsel testified that he could not think of anything he would have done differently. At the conclusion of the hearing, the State introduced the January 2014 Serology/DNA Report into evidence.

Four months after the evidentiary hearing, the post-conviction court granted the Petitioner post-conviction relief from counsel's failure to appeal his case to our supreme court in the form of a delayed appeal and ordered that all of his remaining post-conviction claims be held in abeyance pending the outcome of said appeal. Our supreme court denied the Petitioner's Rule 11 application for permission to appeal on February 13, 2015. On November 13, 2015, the post-conviction court filed an order denying post-conviction relief on the Petitioner's remaining claims. In the order, the post-conviction court addressed the issues raised in the pro se and amended petitions and found that the Petitioner did not receive the ineffective assistance of counsel. Regarding the issue raised during the hearing that counsel was ineffective for failing to argue at sentencing and on appeal that enhancement factor (13) did not apply because the Petitioner's being a registered sex offender in Ohio did not qualify as being on "release," the court held that counsel was not ineffective because he argued on direct appeal of the Petitioner's conviction that the trial court misapplied the factor, and this court affirmed the trial court. The post-conviction court did not address the issue raised at the hearing as to whether counsel was ineffective for failing to have the Petitioner's hand swabs analyzed for DNA.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Generally, [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component. Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

First, the Petitioner contends that counsel was ineffective at trial and on appeal for failing to argue properly that the trial court misapplied enhancement factor (13). He

- 7 -

acknowledges that this court correctly found that being a registered sex offender involved supervision but argues that it did not involve being on "release." He contends that "had his trial and appellate counsel more strenuously argued this point, he likely would have received a lighter sentence." We disagree with the Petitioner.

The Petitioner has not cited any case law in support of his claim that being a registered sex offender does not qualify as being on "any other type of release" for enhancement purposes. In any event, our review of the sentencing hearing transcript reveals that in addition to applying enhancement factor 13(G) to the Petitioner's sentence, the trial court applied enhancement factor (1), that "[t]he defendant has a previous history or criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (5), that "[t]he defendant treated, or allowed the victim to be treated with exceptional cruelty during the commission of the offense"; (6), that "[t]he personal injuries inflicted upon . . . the victim were particularly great"; and (9), that "[t]he defendant possessed or employed a . . . deadly weapon during the commission of the offense." Tenn. Code Ann. § 40-35-114(1), (5), (6), (9). In addition, the court stated that "[t]his was just a horrible, horrible, horrible case," that the victim was "lucky to be alive," that this was "a brutal attack," and that "I don't see anything other than the top of the sentencing range, twelve years." Therefore, even if the trial court misapplied enhancement factor 13(G), the Petitioner was not prejudiced by the error. See State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012) (explaining that a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld").

The Petitioner also contends that trial counsel was ineffective for failing to have DNA analysis performed on all of the physical evidence in this case.[1] He acknowledges that the analysis would not have shown conclusively that he did not penetrate the victim but argues for the first time on appeal that the presence of additional DNA in her vagina could have been helpful in impeaching her credibility because she claimed that she did not work as a prostitute that day. He contends, "Considering the huge disparity between

---

[1] We question whether the Petitioner's hand swabs have been tested as ordered by the post-conviction court on July 1, 2013. According to the Petitioner's brief, "[DNA] analysis revealed that the swab from Mr. Garner's hands contained his own DNA as well as that of the victim." However, the January 2014 Serology/DNA report does not specify which swabs were tested. Moreover, the report states that DNA on the swabs was a mixture in which the major contributor was the victim and the minor contributor was "inconclusive." The report also states that fluid samples and "control samples" were not tested. At the evidentiary hearing, post-conviction counsel advised the post-conviction court that the recent testing was performed on the victim's vaginal swabs.

Mr. Garner's original charges and the conviction offense it is possible that this additional impeachment information could have tilted the jury entirely on Mr. Garner's side."

Initially, we note that issues raised for the first time on appeal are typically waived. State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). In any event, the Petitioner denied that he digitally penetrated the victim, and the jury acquitted him of aggravated rape, which required a finding of penetration. See Tenn. Code Ann. § 39-13-502(a). Instead, the jury convicted him of aggravated sexual battery, which required a finding of sexual contact. See Tenn. Code Ann. § 39-13-504(a). The evidence at trial established that the victim suffered serious injuries and had blood in her vaginal area, and the Petitioner admitted to beating the victim. Trial counsel testified at the evidentiary hearing that the facts of this case were "bad" and that the jury convicted the Petitioner based on photographs of the victim's injuries. Thus, we conclude that additional DNA analysis would not have changed the jury's convicting the Petitioner of aggravated sexual battery.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE